UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MICHAEL EMMET WOLFE,

                 Petitioner,                     Case No. 1:12-cv-600

v.                                         Honorable Robert Holmes Bell

KENNETH McKEE,

                  Respondent.

_____/

## **OPINION**

          This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner pleaded guilty in the Ingham County Circuit Court to one count of armed robbery, MICH. COMP. LAWS § 750.529. On September 17, 2008, he was sentenced as a third felony offender, MICH. COMP. LAWS § 769.11, to a prison term of 15 to 30 years. In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

     I.      IT WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW WHEN THE TRIAL COURT FOUND PETITIONER'S GUILTY PLEA TO BE VOLUNTARILY, KNOWINGLY, AND INTELLIGENTLY MADE, AND DENIED PETITIONER'S MOTION TO WITHDRAW HIS PLEA PRIOR TO SENTENCING.

     II.     IT WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW WHERE THE TRIAL COURT REFUSED TO REOPEN PETITIONER'S CASE WHEN TWO CONVICTIONS RELIED UPON IN SENTENCING WERE SUBSEQUENTLY REVERSED [O]N DIRECT APPEAL.

(Pet. at 6-7, docket #1, Page ID##6-7.)  Respondent has filed an answer to the petition (docket #9) stating that the grounds should be denied because they are procedurally defaulted and have no merit. Upon review and applying the AEDPA standards, the petition will be denied for lack of merit.

**Procedural History**

### A.    Trial Court Proceedings

The state prosecution arose from a home invasion and armed robbery of a resident in an apartment unit, Lena Patterson.  Petitioner was charged with one count of armed robbery, MICH. COMP. LAWS § 750.529, one count of first-degree home invasion, MICH. COMP. LAWS § 750.110a, and one count of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.

A preliminary examination was held on February 5, 2008, for both Petitioner and Nicholas Langham, who also was charged as a co-defendant in the case.  Five witnesses testified at the hearing.

Lena Patterson testified that, on January 1, 2008, she lived on the upper floor at 3106 Holiday Drive in Lansing.  (Prelim. Exam. (PE) Tr. at 5-6, 13, docket #12.)  At approximately 8:30 p.m., Patterson was at her home, having recently returned from shopping at Wal-Mart.  She heard a knock on the door, and she believed it would be Randy King, whom she was expecting home soon. (*Id.* at 6.)  She opened the door, and a man pointed a gun at her and placed his hand over her face, shoving her back.  (*Id.* at 6-7.)  According to Patterson, about 75 percent of her face was covered, but she could still see.  (*Id.* at 15.)  Patterson saw the shoulder of another person as she opened the door, and she knew the second man had slipped in the door behind them and headed to the bedroom. (*Id.* at 7-9.)  The first man repeatedly asked, "Where's the money, where's the safe?"  (*Id.* at 7.)  He

- 2 -

pushed her back until she sat down in a chair. (*Id.* at 8-9, 16.) She screamed, but stopped after the man threatened to kill her. (*Id.* at 8.) After the man removed his hand from her eyes, she watched him surreptitiously. (*Id.* at 9, 17.) Patterson identified the man who had the gun as Petitioner. (*Id.* at 9.) At the time of the robbery, Petitioner had dark hair and a mustache, and he was wearing a down jacket with a hood. (*Id.* at 18.) Patterson described the man as being approximately six feet tall, and weighing about as much as Randy, whom she knew weighed 175 pounds. (*Id.* at 22.)

Patterson testified that, in response to Petitioner's demands about money, she told him where her purse was. He emptied both the purse and the wallet, but they contained no money. (*Id.* at 8-9.) Petitioner threw the purse down and went into the bedroom, which contained a safe. (*Id.* at 9.) According to Patterson, the two men were in the bedroom less than five minutes. They took about $70.00 in change from the safe, as well as two digital cameras. After the men ran out of the apartment, she waited until she heard them go down the stairs. She looked out of the window and saw them run from the front of the house and get into a dark, compact car that had a loud exhaust. (*Id.* at 11-12, 20-21.) Patterson never got a look at the second man, but she heard enough to know that it was a man's voice. (*Id.* at 9, 26-27.)) After the men left, Patterson could not find her cell phone, so she began banging on the neighbor's door, where she eventually was admitted. (*Id.* at 11.)

Some days later, Patterson received a telephone call from an unknown man, who told her that he could give her information about the robbery in exchange for $300.00. (*Id.* at 22.) After speaking with police, she arranged to meet with the man, whom she later learned was Charles Liley, at Olympic Broil. (*Id.* at 22-23.) She had known Charles Liley from when she lived at Camelot Hills with Clarece. (*Id.* at 23.) Patterson testified that she also knew Nicholas Langham, because

he used to work for Randy and had been at their house a number of times.  (*Id.* at 24-25.)  Sometime later, Patterson viewed a photographic lineup prepared by Detective Kranich.  (*Id.* at 28.)

Randy King testified that he lived with Lena Patterson at 3106 Holiday Drive, Apartment 7.  (*Id.* at 29.)  He had a safe in the bedroom, next to his bed.  On January 1, 2008, he had between $75.00 and $80.00 in the safe, all in change.  (*Id.* at 30.)  He had owned the safe since moving into the apartment one-and-one-half years before.   King testified that he knew Nick Langham, the other defendant, and he identified him in court.  (*Id.*)  According to King, Langham knew that King had a safe in the bedroom, because Langham had worked for King in King's roofing business.  (*Id.* at 31.)  At least five others knew he had a safe, including his brother, his friends, and other poker players.  (*Id.* at 31-32.)  King did not know Petitioner.  (*Id.* at 32.)

Charles Liley testified that he knew both Petitioner and Langham.  (*Id.* at 35.)  He had known Langham for about five months, but had only known Petitioner for a few weeks.  He also knew Randy King and Lena Patterson, whom he had known for over a year.  (*Id.* at 36.)  Liley met Petitioner through Langham, who had brought Petitioner over to 611 Sadie Court, where Liley, his girlfriend Clarece, and a number of others were present.  (*Id.* at 37.)  On January 20, 2008, Liley was with Petitioner and Langham at the Sadie Court address, having a conversation in the bedroom. Petitioner and Langham began to talk about a robbery.  (*Id.* at 38.)  According to Liley, Petitioner stated that he "just ran up and stuck the gun in the B's face, and she did everything I asked her to." (*Id.* at 39.)  Petitioner and Langham discussed the money and how they had just run up on a woman and presented a weapon and she had cooperated with them.  (*Id.*)  At some point in the conversation, Liley realized they were talking about Patterson.  Prior to this date, Liley knew that Patterson had been robbed at gunpoint.  (*Id.* at 40.)  Petitioner did most of the talking, and Langham mostly just

laughed. (*Id.*)  Liley remembered them talking about money and a digital camera.  (*Id.* at 41.)
According to Liley, Langham stated that he had just gotten rid of a digital camera he came upon.
(*Id.* at 42.)  Liley believed that Langham and Petitioner were talking about Lena Patterson, and he
contacted her, asking for money.  Liley claimed that he wanted the money to get away from the
situation. (*Id.* at 43.) He provided a statement to Detective Kranich. (*Id.* at 44.) Liley acknowledged
that he had previously worked for Randy King and knew that King had a safe in his bedroom.  At
one time, Liley knew the combination to the safe, but the combination had been changed.  (*Id.* at 47.)

Lansing Police Officer Mike Lam testified that he was dispatched to 3106 Holiday,
Apartment 7 on January 1, 2008, where he met with Lena Patterson about a robbery complaint.  (*Id.*
at 54.) He took her statement and saw that the safe was empty.  He later took another statement from
Patterson's roommate, Randy King.  (*Id.* at 55.)

Lansing Police Detective Kim Kranich testified that he was assigned to work the case
on the Tuesday following New Year's Day of 2008.  (*Id.* at 56-57.)  He interviewed both Lena
Patterson and Randy King at their residence a couple of days later.  (*Id.* at 58.)  He also interviewed
Liley, after Liley was stopped by two officers for contacting Patterson and asking for money.  (*Id.*
at 58.)  After speaking with other officers, Kranich set up a photo line-up for Patterson, which was
randomized by the computer.  He asked Patterson to come into the North Precinct to view it.  (*Id.*
at 59, 62.)  Patterson picked out the man in the number-two space on the line-up, whom Kranich
identified as Petitioner.  (*Id.* at 61, 63.)

At the end of the preliminary examination, Petitioner was bound over on the charges
of home invasion and armed robbery, but not on the felony-firearm charge.  All charges were
dismissed against Nicholas Langham.  (*Id.* at 66-67.)  On March 26, 2008, following a hearing, a

felony-firearm charge was again added.  (Cir. Ct. Docket Sheet at 3-4, docket #11.)  On July 17, 2008, Petitioner pleaded guilty to the armed-robbery charge as a habitual-third offender, in exchange for the dismissal of the home-invasion and felony-firearm charges.  Under the plea agreement, Petitioner agreed to a minimum sentence of 15 years, which fell toward the lower end of the estimated guideline range of 135 to 337 months (or 11.25 to 28 years) for armed robbery as a third felony offender.  The parties agreed that the 15-year minimum also would apply to Case No. 08-000188, in which Petitioner had been convicted by a jury of armed robbery and conspiracy to commit armed robbery.  (Plea Hr'g Tr. at 4-5, 8-9, 14-17, docket #14.)  The prosecutor also represented that the sentences in the two cases would run concurrently rather than consecutively, but they would run consecutively to any sentence Petitioner was required to serve on a parole violation arising out of the same incidents.  (*Id.* at 5, 9.)

On September 17, 2008, Petitioner's sentencing hearing was held.  Immediately prior to sentencing, the trial court denied Petitioner's oral motion to withdraw his plea. (Sentencing Transcript, (S. Tr.), 7-9, docket #15.)   Petitioner was sentenced to serve a term of 15 to 30 years as a third habitual offender on the convictions in issue in this case.  (*Id.* at 13-14.)  At the same hearing, immediately after the court ruled on his sentence in the instant case, Petitioner was sentenced to imprisonment for 13 years and 4 months to 30 years on his jury convictions in the other case.

### B.     Direct Appeal

Petitioner sought leave to appeal to the Michigan Court of Appeals.  His brief, which was filed by counsel on February 25, 2009, raised a single issue:  whether the state court improperly denied his motion to withdraw his plea.  (*See* Def.-Appellant's Br. on Appeal, docket #16.)  By unpublished opinion issued on April 7, 2009, the Michigan Court of Appeals denied leave to appeal

for lack of merit in the grounds presented.  (*See* 4/7/09 Mich. Ct. App. Ord. (MCOA Ord.),
docket #16.)  Petitioner sought reconsideration, which was denied on May 28, 2009.  (*Id.*)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme
Court.  Petitioner raised the same issue presented to and rejected by the Michigan Court of Appeals,
though he attached an order issued by the court of appeals in his other case, which remanded his
other case for resentencing.  (*See People v. Wolfe*, No. 288527 (Mich. Ct. App. Apr. 28, 2009) (Ord.
on Remand), docket #16.)  By order entered October 26, 2009, the Michigan Supreme Court denied
Petitioner's application for leave to appeal because it was not persuaded that the questions presented
should be reviewed.  (*See* Mich. Ord., docket #17.)

### C.    Post-conviction Relief

On February 2, 2010, Petitioner moved for relief from judgment, arguing four grounds
for relief:

I.    [PETITIONER'S] PLEA WAS INVOLUNTARY BECAUSE IT WAS
      MADE PURSUANT TO AN ILLUSORY PLEA AGREEMENT
      WHEREBY THE TRIAL COURT JUDGE AND THE PROSECUTOR
      AGREED THAT SEPARATE CHARGES WOULD NOT RUN
      CONSECUTIVE, WHEN CONSECUTIVE SENTENCING WAS NOT
      AUTHORIZED UNDER LAW.

      (A).    NO AUTHORITY TO SENTENCE CONSECUTIVELY.

      (B).    SUCCESSFUL ATTACK ON SENTENCE[.]

      (C).    ILLUSORY PLEA WARRANTS PLEA[ ]WITHDRAW[AL.]

II.   APPEAL ATTORNEY'S PERFORMANCE ON APPEAL WAS SO
      DEFICIENT AS TO MAKE OUT A CLAIM OF INEFFECTIVE
      ASSISTANCE OF APPELLATE COUNSEL.

      (A).    FAILURE TO RAISE A PARTICULAR CLAIM.

III. THE TRIAL COURT'S SCORING OF OFFENSE VARIABLE No (13) WAS BASED ON A CONVICTION THAT NEVER OCCURRED, RENDERING A SENTENCING BASED ON IMPROPER SCORING OF GUIDELINES WHICH MAKES [PETITIONER'S] PLEA ILLUSORY.

IV. THE OVER-ALL PRE AND POST SENTENCE MODIFICATIONS ARE IN DIRECT VIOLATION OF THE KILLEBREW STANDARD OF MICHIGAN SENTENCING.

(Def.-Appellant's Br. on Appeal of Denial of Relief from J., docket #18.) The court of appeals denied leave to appeal on November 15, 2010, for failure to establish entitlement to relief under MICH. CT. R. 6.508(D). (11/15/10 MCOA Ord., docket #18.) Petitioner sought leave to appeal to the Michigan Supreme Court, raising the same grounds. The supreme court denied leave to appeal for failing to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D). (6/28/11 Mich. Ord., docket #19.)

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court

- 8 -

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.   28 U.S.C. § 2254(d).   This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.   *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.   *Lopez v, Smith*, 135 S. Ct. 1, 4 (2014); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.   *Greene v. Fisher*, 132 S. Ct. 38 (2011).   Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.   *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.   *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).   The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case."   *Id.*   A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law

erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011)).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

### I.     Voluntary Plea

In his first ground for habeas relief, Petitioner raises numerous reasons why his plea was not knowing, intelligent or voluntary. He first argues that his plea was illusory. He also contends that he should have been granted a substitute attorney and that his attorney rendered ineffective assistance of counssel. In addition, Petitioner argues that the trial court improperly participated in the sentence bargaining process, in violation of state law, by reminding Petitioner

during the plea hearing of the risks he faced at trial.  For all these reasons, Petitioner argues that the trial court violated his rights when it denied his motion to withdraw his plea.

As an initial matter, Respondent contends that at least a portion of Petitioner's claim is procedurally defaulted because the trial court denied his motion for relief from judgment on the grounds that he had procedurally defaulted under Rule 6.508(D) of the Michigan Court Rules.  "If a petitioner does not satisfy the procedural requirements for bringing an error to the state court's attention – whether in trial, appellate, or habeas proceedings, as state law may require – procedural default will bar federal review."  *Magwood v. Patterson*, 561 U.S. 320, 130 S. Ct. 2788, 2801 (2010).  Nevertheless, the Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits.  *See Hudson v. Jones*, 351 F.3d 212, 216 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law."), and *Nobles v. Johnson*, 127 F.3d 409, 423-24 (5th Cir. 1997) (deciding against the petitioner on the merits even though the claim was procedurally defaulted)).  *See also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Where, as here, the procedural default issue raises more questions than the case on the merits, the Court may assume without deciding that there was no procedural default or that Petitioner could show cause and prejudice for that default.  *See Hudson*, 351 F.3d at 215-16; *Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

To the extent that Petitioner argues that he has a right under state law to withdraw his plea, his claim is not cognizable in this proceeding. A state defendant has no constitutionally guaranteed right to withdraw a guilty plea. *See Carwile v. Smith*, 874 F.2d 382 (6th Cir. 1989). The only constitutional challenge that a habeas court may entertain with regard to a plea of guilty is that the plea was not entered in a knowing and voluntary fashion under the standards set forth in *Boykin v. Alabama*, 395 U.S. 238 (1969). A habeas court is restricted to these federal principles, and may not grant habeas relief on the basis of state law governing the taking or withdrawal of guilty pleas. *Riggins v. McMackin*, 935 F.2d 790, 794-95 (6th Cir. 1991). Consequently, the question whether petitioner should have been allowed in the court's discretion to withdraw his guilty plea under state-court rules is not reviewable in habeas corpus.

Also, to the extent that Petitioner argues that the trial court participated in the plea in violation of *People v. Killebrew*, 330 N.W.2d 834 (Mich. 1982), and *People v. Cobbs*, 505 N.W.2d 208 (Mich. 1993), he fails to state a claim of constitutional dimension. "[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 131 S. Ct. at 14; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Therefore, Petitioner's claim that his plea hearing violated state law is not cognizable in this proceeding.

- 12 -

Respecting Petitioner's constitutional challenges to the validity of his plea, it has long been the case that a valid guilty plea bars habeas review of most non-jurisdictional claims alleging antecedent violations of constitutional rights. *See Tollett v. Henderson*, 411 U.S. 258, 267 (1973). Among claims not barred are those that challenge "the very power of the State to bring the defendant into court to answer the charge against him," *Blackledge v. Perry*, 417 U.S. 21, 30 (1974), and those that challenge the validity of the guilty plea itself. *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985); *Haring v. Prosise*, 462 U.S. 306, 320 (1983); *Tollett*, 411 U.S. at 267. A plea not voluntarily and intelligently made has been obtained in violation of due process and is void. *See McCarthy v. United States*, 394 U.S. 459, 466 (1969). Petitioner's claim does not challenge the power of the state to bring him into court. Thus, the only means available for challenging his conviction is to claim that his plea is invalid, i.e., it was not knowingly and voluntarily entered into. *See Mabry v. Johnson*, 467 U.S. 504, 508 (1984) ("It is well-settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked.").

The test for determining a guilty plea's validity is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)); *Boykin v. Alabama*, 395 U.S. 238, 242-43 (1969). Courts assessing whether a defendant's plea is valid look to "all of the relevant circumstances surrounding it," *Brady v. United States*, 397 U.S. 742, 749 (1970), and may consider such factors as whether there is evidence of factual guilt. The defendant must have notice of the nature of the charges against him. *Henderson v. Morgan*, 426 U.S. 637, 645 n.13 (1976). The plea must be entered "voluntarily"; it must not be the product of "actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant" or of

state-induced emotions so intense that the defendant was rendered unable to weigh rationally his options with the help of counsel. *Brady*, 397 U.S. at 750; *Machibroda v. United States*, 368 U.S. 487, 493 (1962) ("A guilty plea, if induced by promises or threats which deprive it of the character of a voluntary act, is void."). The defendant must understand the consequences of his plea, including the magnitude of the sentence he is facing and the nature of the constitutional protections he is waiving. *Henderson*, 426 U.S. at 645 n.13; *Brady*, 397 U.S. at 755; *Machibroda*, 368 U.S. at 493 ("Out of just consideration for persons accused of crime, courts are careful that a plea of guilty shall not be accepted unless made voluntarily after proper advice and with full understanding of the consequences.") (internal quotations and citation omitted). Finally, the defendant must have available the advice of competent counsel. *Tollett*, 411 U.S. at 267-68; *Brady*, 397 U.S. at 756; *McMann v. Richardson*, 397 U.S. 759, 771 & n.14 (1970). The advice of competent counsel exists as a safeguard to ensure that pleas are voluntarily and intelligently made. *Hill*, 474 U.S. at 57; *Brady*, 397 U.S. at 754 (suggesting that coercive actions on the part of the state could be dissipated by counsel).

When a state defendant brings a federal habeas petition challenging the voluntariness of his plea, the state generally satisfies its burden of showing a voluntary and intelligent plea by producing a transcript of the state-court proceeding. *Garcia v. Johnson*, 991 F.2d 324, 326 (6th Cir. 1993); *see also McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (citing *Garcia*, 991 F.3d at 326). Where the transcript is adequate to show that the plea was voluntary and intelligent, a presumption of correctness attaches to the state court findings of fact and to the judgment itself. *Id.* A satisfactory state-court transcript, containing findings after a proper plea colloquy, places upon petitioner a "heavy burden" to overturn the state findings. *Id.* at 328; *see also Parke v. Raley*, 506

U.S. 20, 29 (1992) (holding that the factual findings of voluntariness made by the state court are entitled to a presumption of correctness); *Blackledge v. Allison*, 431 U.S. 63, 73 (1977) (a solemn plea of guilty presents a "formidable barrier" to a subsequent claim to the contrary).

The state has met its burden in the instant case by providing a copy of the plea transcript.  The transcript demonstrates that the trial court conducted an extensive inquiry into the terms of the plea agreement, Petitioner's understanding of that agreement, Petitioner's satisfaction with his attorney, and the voluntariness of the plea:

THE COURT:  Do you have any complaints regarding your attorney's conduct, Mr. Wolfe?

THE DEFENDANT:  I mean, for the first case, I mean, I – he fought hard, but we lost, you know.

THE COURT:  And that happens, and it was up to the jury.  That's not really a complaint.

THE DEFENDANT:  I mean –

THE COURT:  I ask people that before they plead.

THE DEFENDANT:  I'm sorry, you misunderstand what I'm saying.  As far as this case right here, I don't feel that, you know, he's – I mean, he came to me one time.  I feel like I'm getting pressured to take the 15, but at the same time, I feel like I ain't got no choice of how he explained it to me, so –

THE COURT:  Mr. Tomal is a very experienced criminal lawyer.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And if he's recommending that you take this plea agreement, you need to seriously consider that.  If you don't, you can have another trial, but then you're looking at –

MR. TOMAL (defense counsel):  Twenty-eight at the top end of the range.

THE COURT:  Twenty-eight years?

- 15 -

MR. TOMAL:  At the top of the range.

THE COURT:  Up to 28 years.

THE DEFENDANT:  I would admit my guilt even without the plea because the fact remains that this case, you know, is slightly different than the other case. Well, actually, it's a whole lot different because I committed this case, this crime. The first case, I did not commit.

THE COURT:  I understand the situation with the first case, but the jury found you guilty.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  So do you understand what you're charged with in this case.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And how do you wish to plead?

THE DEFENDANT:  I plead guilty, your Honor.

THE COURT:  Raise your right hand, please.  Do you swear to tell the truth, the whole truth, and nothing but the truth under the penalty of perjury?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And is there a plea agreement, Mr. O'Keefe, if you'd state it or the record?

MR. O'KEEFE (prosecutor):  Yes, your Honor.  Upon successful plea and sentence to Count 1, armed robbery as a third-felony offender, the People will dismiss Count 2, home invasion in the first degree.  Count 3 was dismissed at the preliminary examination.  We also would dismiss Count 4, felony firearm, and we are – we have come to a sentence agreement pursuant to *People v. Killibrew*[1] that the Defendant will do 15 years on the nose for –

THE COURT:  On the minimum?  On the minimum?

---

[1]330 N.W.2d 834, 841-42 (Mich. 1982) (holding that, if a plea agreement includes an agreement to a fixed term of years and the judge determines that a higher sentence will be imposed, the defendant must be given the opportunity to withdraw his plea).

MR. O'KEEFE:  On the minimum.

MR. O'KEEFE:  So he'll do 14 [sic] years, 180 months on the nose, up to whatever maximum the Court chooses to impose, and that would run concurrent, that sentence will run concurrent with the other file, which is 08-188-FC.

THE COURT:  Okay.  Is that your understanding of the plea agreement also, Mr. Tomal?

MR. TOMAL:  That's correct; 180 months, which is 15 years, would run concurrent with the other file as the prosecutor just mentioned, yes.

MR. O'KEEFE:  I guess I would say, as far as the other file goes, that would be the same recommendation, the same sentence agreement is that he would do 15 years on that file as well.

THE COURT:  Okay.  And you'll waive reading of Count 2 and Count 4?

MR. TOMAL:  Yes.

THE COURT:  Would you read the Information, please?

MR. O'KEEFE:  The Information states that on January 1st, 2008, at 3106 Holiday Drive in the city of Lansing, county of Ingham, state of Michigan, that Defendant, Michael Emmet Wolfe, did, in the course of committing a larceny of money, use force or violence against a person present, Lena Patterson, and in the course of that conduct possessed a handgun, a dangerous weapon, contrary to state law.  That is a felony, punishable by life or any term of years unless aggravated assault or serious injury involved, then not less that two years.

Take notice that the Defendant was twice previously convicted of a felony or an attempt to commit a felony; in that, on or about December 2nd of 1998, he was convicted of the offense of CCW in violation of state law in the 30th Circuit Court for Ingham County, state of Michigan, and that on or about January 15, 2003, he was convicted of the offense of delivery of a controlled substance in violation of state law in the 30th Circuit Court for Ingham County in the state of Michigan.

THE COURT:  Okay.  And the Court understands, Mr. Wolfe, that you're pleading guilty to County 1, which is armed robbery, and being a habitual offender, third.

- 17 -

Armed robbery is a felony with a maximum penalty of up to life or any term of years.  And as a habitual offender, it would, um, double the maximum sentence. Do you understand?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And are you currently on probation or parole?

THE DEFENDANT:  I'm on parole, ma'am.

THE COURT:  Was he on parole at the time he committed these offenses?

MR. O'KEEFE:  I believe so, your Honor.

THE COURT:  So isn't there an issue of consecutive sentencing?

MR. O'KEEFE:  As far as the consecutive to the parole, yes, but I wanted to make it clear that these two cases would not run consecutively with one another.

MR. TOMAL:  That's correct.

THE COURT:  Do you understand if the Court accepts your plea today, it could result in a parole violation?

THE DEFENDANT:  Yes, ma'am

THE COURT:  Okay.  You still want to go ahead and plead guilty?

THE DEFENDANT:  Yes, ma'am.
                              . . .

THE COURT:  Can you read and understand English?

THE DEFENDANT:  Yes.

THE COURT:  Did you read your written advice of rights form?

THE DEFENDANT:  Yes.

THE COURT:  Is that your signature on the bottom?

THE DEFENDANT:  Yes.

THE COURT:  Do you wish to voluntarily waive the rights contained in your advice of rights form?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And do you have any question about what your rights are or what rights you're giving up by pleading guilty today?

THE DEFENDANT:  As far as I just want to make it clear my lawyer told me that, um, it ain't going to pertain to my first case because I am appealing the first case.  I should have a court date the twenty-first for new trial or so forth, so.

THE COURT:  You still have all of your appellate rights on any other cases.

THE DEFENDANT:  Thank you, ma'am.

THE COURT:  Okay.  So do you have any question about what your rights are or – in this case or what rights you're giving up by pleading guilty today?

THE DEFENDANT:  No ma'm.

THE COURT:  Okay.  And do you understand if your plea is accepted, you'll be giving up any claim that the plea was the result of promises or threats, which are not disclosed during this plea?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Also you're giving up any claim that it is not your choice to plead to this charge.

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And do you understand that any appeal of the conviction and the sentence will be by an application for leave and not by right?

THE DEFENDANT:  Is the application for leave a 6.500?

THE COURT:  No. That doesn't have anything to do with your appellate rights.  That's something way down the road. . . .  I mean . . . when – you had a jury trial.  You had a jury trial, Mr. Wolfe, so you have a right to appeal that conviction.  But when you plead guilty, you appeal by application for leave to appeal.  You have to ask the Court of Appeals to look at your sentence and your conviction.

- 19 -

THE DEFENDANT:  Okay.

. . .

THE COURT:  Is your understanding of the plea agreement, Mr. Wolfe, what you heard today in court?

THE DEFENDANT:  Yeah.

THE COURT:  Has anyone promised you anything else in order to get you to plead guilty?

THE DEFENDANT:  I wish.  No.

THE COURT:  Do you understand this Court has not entered into any agreements in relation to your plea or your sentence, and although there is a sentence agreement between the prosecutor and your attorney for a 15-year cap on the minimum, the Court is not bound by that agreement, but if I was going to sentence you to more time in prison, I would give you an opportunity to withdraw your guilty plea.

THE DEFENDANT:  Okay.

THE COURT:  Your Honor?

THE COURT:  There is also an agreement –

MR. O'KEEFE:  It's not a cap.  It's an agreement he'll get 15 years.

THE COURT:  Okay.  That's a *Killebrew* agreement?

MR. O'KEEFE:  Yes.

THE COURT:  You'll get 15 years.  Do you understand?

THE DEFENDANT:  Yes.

THE COURT:  And if I was going to give you more time, I would give you an opportunity to withdraw your guilty plea.  Do you understand?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And had anyone threatened you in any way to get you to plead guilty?

- 20 -

THE DEFENDANT:  No, nobody has threatened me.

THE COURT:  Okay.  Is it your own choice to plead guilty?

THE DEFENDANT.  On the grounds of feeling I ain't got no choice, yes, ma'am.

THE COURT:  Well, you do have a choice.  You can have a jury trial.

THE DEFENDANT:  I don't want to go to jury.  I'm guilty.

THE COURT:  Okay.  Then, you know, we have to – you either have a jury trial, or you plead guilty, and I think that you have been informed of the ramifications on this case and your other case, Mr. Wolfe.  I understand your reluctance to plead guilty especially knowing you're going to spend the next 15 years in prison.  That's understandable that you're reluctant, but you have to consider the fact that if you let – go to a jury trial and have the jury make the decision on this, you may well end up with many more years in prison –

THE DEFENDANT:  Yes, ma'am.

THE COURT:  – or you could end up not guilty, or you could also be found guilty of the felony firearm charge, which would add a maximum – er, a mandatory two years' additional to your sentence.  So that's being dismissed as part of the plea agreement.

THE DEFENDANT:  I feel like I'm going to have to accept my responsibilities, so – on this case.

THE COURT:  Okay.  And are you pleading guilty because you are guilty in this case?

THE DEFENDANT:  Yes, ma'am.  I don't want to put Lena through no more problems.

(Plea Tr. at 6-17.)  The Court then inquired as to the factual basis for the plea, and Petitioner admitted "enter[ing] Lena Patterson's home with a BB gun to put her in fear to take some money from her."  (*Id.* at 17.)  As discussed in the plea colloquy, Petitioner also executed a waiver of his trial rights, in which he agreed to give up the following rights:  his right to a trial by jury; to be

- 21 -

presumed innocent until proven guilty; to have the prosecutor prove guilty beyond a reasonable doubt; to have the witnesses against him appear at trial; to question those witnesses; to have his defense witnesses called to appear; to remain silent; to not have that silence used against him; and to testify if he wished to do so.  (Advice of Rights Form, docket #22.)

The transcript of the plea hearing, when coupled with the signed waiver-of-rights form, indicates that Petitioner was fully advised of the terms of his plea agreement and properly waived each of his trial rights.  *See United States v. Calderon*, 388 F.3d 197, 199 (6th Cir. 2004) (may waive any right, even a constitutional one, by signing a plea agreement); *Raley v. Parke*, 945 F.2d 137, 141-42 (6th Cir. 1991) (holding that a waiver of rights form is adequate to show a valid waiver), *rev'd on other grounds*, 506 U.S. 20 (1992).  Petitioner signed the advice of rights form, and he affirmed on the record that he had read, understood and signed it.  (Plea Tr. at 12.)  Moreover, the transcript of the plea agreement demonstrated both that Petitioner could read and was capable of a nuanced understanding of his rights, as he asked a number of questions and expressly reserved his appellate rights in the other case.  Petitioner repeatedly and unequivocally stated that he intended to plead guilty, that he understood the terms of his plea agreement, that his decision to plead guilty was voluntary, and that he was not coerced.  On the whole of the circumstances, Petitioner's transcript demonstrates that Petitioner's guilty plea was voluntary.

Petitioner argues, however, that the prosecutor's promise was illusory.  He contends that the plea transcript demonstrates that he believed that he faced the risk  that his sentence arising out of the instant case could be imposed consecutively to the sentence he received in the case in which he had been found guilty.  Because such a consecutive sentence was not permissible under state law, he contends that his rights were violated.

If a prosecutor's promise is illusory, then a plea is involuntary and unknowing. *United States v. Randolph*, 230 F.3d 243, 250–51 (6th Cir. 2000).  However, where a defendant is "fully aware of the likely consequences" of a plea, it is not unfair to expect him to live with those consequences.  *Mabry v. Johnson*, 467 U.S. 504, 511 (1984).  Under long-established Sixth Circuit authority, a petitioner's responses to the trial judge, given under oath at the plea hearing, preclude his subsequent assertion that he entered into a plea in reliance on different terms.  *See Smith v. Anderson*, 632 F.3d 277, 282 (6th Cir. 2011) (citing *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986) (holding that, where the trial court inquires about the terms of a plea bargain and receives confirmation from the prosecutor, defense counsel, and the defendant about those terms and the absence of other promises, "the defendant is bound by his statements in response to that court's inquiry")).  A plea-proceeding transcript which suggests that a guilty or no contest plea was made voluntarily and knowingly creates a "heavy burden" for a petitioner seeking to overturn his plea. *Garcia v. Johnson*, 991 F.2d 324, 326–28 (6th Cir. 1993).

In exchange for Petitioner's guilty plea to armed robbery as a third felony offender, the prosecutor agreed to dismiss the charges of home invasion and felony firearm.  (Plea Tr. at 4-5.) The minimum guideline range on the reduced charge of armed robbery was estimated at between 11.25 and 28 years, but the offense had a maximum sentence of life imprisonment.  Moreover, had Petitioner been convicted on the felony-firearm charge, he would have faced a mandatory consecutive sentence of two years.  (*Id.* at 10-11.)  Petitioner also avoided the home-invasion charge, which, if Petitioner had been found guilty of both armed robbery and home invasion, could result in consecutive sentences. *See* MICH. COMP. LAWS § 750.110a(8) ("The court may order a term of imprisonment imposed for home invasion in the first degree to be served consecutively to any term

of imprisonment imposed for any other criminal offense arising from the same transaction."). In addition, in the other case in which Petitioner already had been convicted by a jury of armed robbery and conspiracy to commit armed robbery, Petitioner was facing identical maximums and nearly identical sentencing, which would again have exposed him to a minimum term of 28 years. (Plea Tr. at 5-6.) The record also reflects that Petitioner had five prior felony convictions, six prior misdemeanors, and a juvenile record that included two parole violations, two misdemeanors, and two low-level felonies. (*Id.*) On that criminal record, and given that Petitioner was on parole at the time he allegedly committed the offenses at issue in the instant case and the two felonies for which he had just been found guilty in Case No. 1:08-000188, Petitioner faced significant risk that he would not be sentenced at the bottom of the guidelines range, but could face a minimum of as much as 28 years.

As a result, Petitioner's plea was far from illusory; it conferred substantial benefits on Petitioner. Moreover, contrary to his representations, neither the prosecutor nor the trial court suggested at any time that Petitioner faced the risk of being sentenced consecutively on his two cases, if he did not plead guilty. The prosecutor merely made clear that the sentences in the two cases would run concurrently to one another, but that they would be consecutive to the sentences for the convictions on which he was on parole. (Plea Tr. at 5.) In fact, the prosecutor expressly advised that, even if Petitioner went to trial, the sentences on the two cases would run concurrently:

> THE COURT: If he goes to trial on this case, would it be concurrent or consecutive?
>
> MR. O'KEEFE: It would be concurrent, your Honor, because both of those offenses were committed before he was charged or before he was placed on bond, so they would be concurrent either way.

(*Id.*)  Further, Petitioner averred at the hearing that he had been made no promises other than those disclosed at the plea hearing, and his decision to plead guilty was voluntary.  (*Id.* at 15-16.)  In light of the clear plea transcript, Petitioner's argument that his plea agreement was illusory is wholly meritless.

Petitioner next argues that he expressly informed the trial court that he was unhappy with his attorney's performance and that he believed that his attorney had not met with him on sufficient occasions.  He suggests that his representations to the court demonstrate that he had alleged a complete breakdown the attorney-client relationship and that he should have been permitted new counsel.

The Sixth Amendment provides a criminal defendant with the right "to have the Assistance of Counsel for his defense."  U.S. Const., amend. VI.  One element of that right is the right to have counsel of one's choice.  *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 148 (2006).  However, the right to counsel of choice is not without limits.  *Id.* at 148; *United States v. Mooneyham*, 473 F.3d 280, 291 (6th Cir. 2007).  "[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them."  *Gonzalez-Lopez*, 548 U.S. at 151 (citing *Wheat v. United States*, 486 U.S. 153, 159 (1988), and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989)).  "'An indigent defendant has no right to have a particular attorney represent him and therefore must demonstrate "good cause" to warrant substitution of counsel.'"  *Mooneyham*, 473 F.3d at 291 (quoting *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990)); *see also Caplin & Drysdale*, 491 U.S. at 624 ("[T]hose who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.").  Thus, where a court is faced with a defendant's request to effect

a change in his representation by way of a motion to substitute counsel, the court must determine

whether there is good cause for the substitution by balancing "the accused's right to counsel of his

choice and the public's interest in the prompt and efficient administration of justice." *United States*

*v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996).

While Petitioner expressed some limited dissatisfaction with the plea and with his

attorney's inability to negotiate better terms, he did not allege facts that would show a complete

breakdown in the attorney-client relationship or that counsel was providing ineffective assistance.

*See Caplin & Drysdale*, 491 U.S. at 624.  In fact, he at no time argued that his attorney had rendered

ineffective assistance, and he abandoned his complaints about his attorney by declaring his intent

to plead guilty rather than proceed to trial.  In addition, in the face of Petitioner's hesitancy about the

terms of the plea agreegment, the court expressly reminded Petitioner that he was not bound to plead

guilty, but had the choice to proceed to jury trial.  (Plea Tr. at 16.)  Petitioner nevertheless renewed

his decision to plead guilty, stating, "I don't want to go to jury.  I'm guilty."  (*Id.*)  Moreover, the

fact that Petitioner made additional complaints about his attorney when he sought to withdraw his

plea at the time of sentencing does not undermine his solemn decision to accept guilt at the time he

entered his plea.  *See Blackledge*, 431 U.S. at 73.

Further, Petitioner falls far short of demonstrating that his attorney rendered

ineffective assistance of counsel in recommending the plea.  In *Strickland v. Washington*, 466 U.S.

668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of

ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the

petitioner must prove:  (1) that counsel's performance fell below an objective standard of

reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in

an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

The two-part *Strickland* test applies to challenges to guilty pleas based on ineffective assistance of counsel. *Hill*, 474 U.S. at 58. Regarding the first prong, the court applies the same standard articulated in *Strickland* for determining whether counsel's performance fell below an objective standard of reasonableness. *Id.* In analyzing the prejudice prong, the focus is on whether counsel's constitutionally deficient performance affected the outcome of the plea process. "[I]n order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

Petitioner fails to meet either prong of the applicable standard. Although Petitioner argues that trial counsel should have objected in some way to the prosecutor's use of the guilty verdicts in the other case to drive a hard bargain, he fails entirely to overcome the presumption that trial counsel's performance was reasonable. As fully discussed, *infra*, defense counsel negotiated

an agreement that guaranteed that Petitioner would receive a minimum prison term of 15 years, just over half of the maximum term calculated under the guidelines for both the offense at issue and the other two convictions awaiting sentencing. In addition, by accepting the plea, Petitioner avoided possible conviction on two offenses that each could have increased his sentence substantially. No basis exists for concluding that any other attorney could have obtained a better plea offer, however much Petitioner might have wished for such an offer, or that recommending acceptance of the offer made was unreasonable.

Further, Petitioner at no time represents that he would not have pleaded guilty had counsel represented him differently. Instead, it is apparent from the record that Petitioner merely regretted his decision to plead guilty some time after it was entered. Where, as here, Petitioner expressly declared under oath that he intended to waive his rights, did not wish to proceed to trial, and wished to plead guilty, he has failed to overcome his heavy burden of demonstrating a contrary intent. *See Garcia*, 991 F.3d at 326; *Blackledge*, 431 U.S. at 73.

For all these reasons, Petitioner fails to overcome the presumption that the state court's decision that his plea was knowing, intelligent and voluntary was reasonable.

II.    Effect of Reversal of Other Convictions

In his second ground for habeas relief, Petitioner contends that he should have been permitted to withdraw his plea after his jury convictions in the prior case had been reversed on direct appeal.[2] He also argues that, because the sentence he was offered and accepted was based in some

---

[2]Notwithstanding Petitioner's characterization of the issue, his convictions in the other case were not reversed on appeal. Instead, the Michigan Court of Appeals issued an order denying Petitioner's motion to remand on grounds of ineffective assistance of counsel and prosecutorial misconduct, but granting the motion to remand respecting the scoring of three variables of the sentencing guidelines. *See People v. Wolfe*, No. 288527 (Mich. Ct. App.) (Ord. of Remand Mar. 27, 2009), http://publicdocs.courts.mi.gov:81/coa/public/orders/2009/288527(15)_order.pdf. However, on a motion for reconsideration by the prosecutor, the Court withdrew its order of remand on the sentencing matters, but

- 28 -

part on his prior convictions, he was sentenced on the basis of inaccurate information, in violation of his right to due process.

As previously discussed, Petitioner has no constitutionally guaranteed right to withdraw a guilty plea. *See Carwile*, 874 F.2d 382. The only constitutional challenge that a habeas court may entertain with regard to a plea of guilty is that the plea was not entered in a knowing and voluntary fashion under the standards set forth in *Boykin*, 395 U.S. 238.

As the Court has thoroughly discussed *supra*, Petitioner's plea was knowingly and voluntarily entered. Moreover, the subsequent reversal of his conviction in the other case awaiting sentencing at the time of the plea does not undermine the validity of Petitioner's plea in the instant case. At the time he entered his plea, Petitioner asked whether it would have any effect on his right to appeal from his jury convictions in Case No. 08-000188. (Plea Tr. 13.) The trial court assured Petitioner that his right to appeal in the other case could not be affected by his plea in the instant case. (*Id.* at 13-14.) And Petitioner indicated that he had a hearing coming up shortly on his motion for new trial in Case No. 08-000188. (*Id.* at 13.) Further, Petitioner steadfastly contended that he was not guilty of the actions underlying the jury convictions. (*Id.* at 7.) It therefore is apparent from the record that Petitioner believed that he was not guilty in the other case and understood that his convictions in that case that the potential to be overturned on appeal or that he might be granted a new trial. Because he was fully aware at the time of his plea that his prior convictions could be

---

permitted remand to allow the trial court to allow Petitioner to bring a renewed motion for new trial on the grounds of newly discovered evidence. *Id.* (Ord. on Reconsid. Apr. 28, 2009), http://publicdocs.courts.mi.gov:81/coa/public/orders/2009/288527(22)_order.pdf. On June 24, 2009, the appeal was dismissed by stipulation, because the trial court had granted Petitioner a new trial. *Id.* (Ord. of Dismissal June 24, 2009), http://publicdocs.courts.mi.gov:81/coa/public/orders/2009/288527(27)_order.pdf. Petitioner represents in his brief in support of the petition that the case ultimately was dismissed by the prosecutor on October 12, 2009. (Br. in Supp. of Pet., docket #3, Page ID#166.)

reversed, he cannot demonstrate that his plea was in any way dependent upon his guilt in the other action.

Moreover, the overturning of his convictions in Case No. 08-000188 did not render his guilty plea illusory.  As the Court previously discussed in detail, Petitioner obtained a substantial bargain in exchange for his plea.  While he may have been better able to negotiate a favorable plea offer from the prosecutor had he not been found guilty in Case No. 08-000188, he stood convicted at the time of the plea and nevertheless made the decision to accept the plea agreement as it was offered to him.  In doing so, he abandoned any opportunity for a jury to find him not guilty in the case before the Court, and he accepted the risk that something could happen to vacate the jury's conviction in Case No. 08-000188.

In sum, nothing about the subsequent reversal of his convictions in Case. No. 08-000188 undermines the Court's prior determination that his plea was knowingly and voluntarily entered.

Petitioner next argues that he was sentenced on the basis of inaccurate information. It is well established that a court violates due process when it imposes a sentence based upon materially false information.  *United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke*, 334 U.S. 736, 740 (1948) (citation omitted).  To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence.  *Tucker*, 404 U.S. at 447.

Here, Petitioner can demonstrate neither portion of the standard.  First, no inaccurate information was presented to the court.  It is beyond dispute that Petitioner stood convicted of two

charges in Case No. 08-000188 at the time he entered his plea.  The information before the court therefore was not false.

In addition, his convictions in Case No. 08-000188 did not form the basis for his exposure to sentencing as a third habitual offender.  (Plea Tr. at 10 (indicating that the predicate convictions for the enhancement were committed in 1998 and 2003).)  Moreover, Petitioner was sentenced on the basis of his own plea agreement, not on the basis of any sentencing information. The court therefore did not rely on any false information in setting the sentence.  It relied only on the facts admitted by Petitioner in accepting his plea.

In sum, Petitioner has demonstrated no constitutional rationale under which the dismissal of his convictions in Case No. 08-000188 would warrant habeas relief in this action. Accordingly, Petitioner's second ground for habeas relief will be denied.

## Conclusion

In light of the foregoing, the Court will deny the petition because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).   The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529

- 31 -

U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

        The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

        A Judgment and Order consistent with this Opinion will be entered.


Dated: <u>March 19, 2015</u>                              <u>/s/ Robert Holmes Bell</u>
                                                                    ROBERT HOLMES BELL
                                                                    UNITED STATES DISTRICT JUDGE